## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CYNTHIA ULMER, | ) | CASE NO. 8:06CV372 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| MIDWEST FITNESS SYSTEMS, INC., | ) | MEMORANDUM AND ORDER |
| d/b/a Gold's Gym, and NORTHWEST | ) | |
| FITNESS SYSTEMS, INC., d/b/a | ) | |
| Gold's Gym, | ) | |
| | ) | |
| Defendants. | ) | |

This matter is before the Court on the Defendant's Motion for Summary Judgment (Filing No. 36). On May 17, 2006, Cynthia Ulmer ("Ulmer") filed a Complaint against the Defendants, Midwest Fitness Systems, Inc., and Northwest Fitness Systems, Inc.  In part, the Complaint alleges that the Defendants failed to hire Ulmer based on her sex and her national origin in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* (2000).  The Complaint also alleges that the Defendants retaliated against Ulmer by not hiring her because she complained about several questions posed to her during the final interview.  Ulmer also alleges that the Defendants discriminated against her because of her sex, national origin, and marital status in violation of the Nebraska Fair Employment Practices Act, ("NFEPA") Neb. Rev. Stat. 48-1101 *et seq.* (2006).  (Filing No. 1, Complaint).  For the reasons set forth below, the Motion for Summary Judgment will be granted.

## FACTS

Both Midwest Fitness Systems, Inc., d/b/a Gold's Gym ("Midwest") and Northwest Fitness Systems, Inc., d/b/a Gold's Gym ("Northwest") are Nebraska corporations with their

principal place of business in Omaha. (Complaint ¶ 5, 6; Filing No. 9, Answer ¶ 5, 6). Ulmer acknowledges that while the two companies are separate, they share mutual or common offices, hiring personnel, and practices.  (Complaint ¶ 7; Plaintiff's Brief ¶ 1).[1]  The issue has not been briefed, and for purposes of this motion, the Court will treat Midwest and Northwest as related entities and refer to them collectively as the "Defendants."

On April 16, 2004, Ulmer applied to work as a Fitness Consultant with the Defendants.  (Defendants' Brief ¶ 2; Plaintiff's Brief ¶ 3).  The position of Fitness Consultant is primarily a sales position with compensation based on the number of gym memberships sold. (Defendants' Brief ¶ 2; Plaintiff's Brief ¶ 2).  The Defendants' Human Resources Coordinator, Larry Leas ("Leas"), conducted the initial interviews for the Fitness Consultant positions, including Ulmer's initial interviews.  (Defendants' Brief ¶ 4; Plaintiff's Brief ¶ 4).  Leas prepared interview summaries regarding each applicant.  (Leas Dep. 10:18 to 13:12).  Based on the initial interviews, Leas referred Ulmer and others to the Club Manager, Ryan Hague ("Hague"), and the part-owner and then-General Manager, Joel Potter ("Potter") for final interviews. (Defendants' Brief ¶ 4; Plaintiff's Brief ¶ 4).  Potter was at all relevant times in a supervisory position over both Leas and Hague. Ulmer states that nothing objectionable was asked during her initial interviews with Leas.  (Ulmer Dep. 16:5-10).

---

[1] Citation to the undisputed facts set forth in the parties' briefs and supported by pinpoint citation to the record will be identified as "Defendants' Brief" by numbered paragraph, which can be located at Filing No. 38, and as "Plaintiff's Brief" by numbered paragraph, which can be located at Filing No. 41.  Depositions will be identified by the deponent's last name and page number.  The depositions are found at Filing No. 37, except that Ulmer's full deposition can be found at Filing No. 43.

Potter states that he asked all the applicants for the Fitness Consulting positions the same prepared questions. (Potter Dep. 61; Hague Dep. 15:12-15.)   A copy of the Defendants' standard interview questions is included in the Defendant's evidentiary submissions.  (Filing No. 37, Defendants' Index of Evidence, Exhibit G).  The questions asked by Potter included: "where were you born," "where were you raised," and "can we get a reference from a former boyfriend/girlfriend."  (*Id.*)

On April 30, 2004, Potter and Hague interviewed Ulmer.  (Defendants' Brief ¶ 5; Plaintiff's Brief ¶ 5).  During 2004, the Defendants conducted criminal background checks, credit history checks, and reference checks on all applicants.  (Potter Dep. 58:9-59:2).  Ulmer alleges that in addition to the Defendants' standard interview questions, Potter asked Ulmer about her family history, whether she was married, why her parents chose not to have more children, the ages of her siblings, her relationship with her parents, and why she did not get along with her mother. (Filing No. 42, Plaintiff's Index of Evidence, attachment 10, NEOC Charge of Discrimination).

During the interview, Ulmer described two businesses she had owned, and it was apparent to Potter and Hague that Ulmer had provided inconsistent answers related to the disposition of these businesses.   (Potter Dep. 73:12-16, 121:7-15; Hague Dep. 15:12-16:13).  In response to Potter's first question on the subject, Ulmer stated that she sold both businesses, but when Potter came back to the subject later, Ulmer stated that she had sold one and closed the other, apparently due to financial difficulties.  Potter perceived Ulmer's inconsistency to be an intentional misstatement.  Potter asked her to explain something about her credit history check, which, in Potter's recollection, caused Ulmer to become angry.  She communicated her anger through her voice and body

3

language.  Potter also stated that Ulmer failed to communicate to him that she had any particular passion for fitness.  (Filing No. 42, Potter Dep. 72:12-77:24).  He also found Ulmer to be vague when explaining her reason for moving to Omaha from Kansas.

Hague stated that he asked no questions during Ulmer's interview because he was fairly new to the club and Potter was "mentoring" him by showing him how to interview. Hague stated that he felt they had "caught her in a lie" regarding the disposition of her businesses.  Hague agreed that Ulmer appeared "frustrated" during the interview, describing that she crossed her arms when Potter and she were disagreeing about how fitness and healthcare are related.  Hague recalled that at some time after Ulmer began to act frustrated, she began answering questions with the phrase "I concur."  (Hague Dep. 15:12-16:17, 17:2-15).   Ulmer neither concedes nor disputes that she became angry, but argues only that if she did, it was based on the inappropriate nature of the questions being posed to her by Potter.  (Plaintiff's Brief at ¶ 8, p.4).

Potter decided not to offer Ulmer a job as a Fitness Consultant.  He states that he reached that conclusion during the interview based on her inconsistent explanations about the closing of her businesses, her lack of passion for fitness, and the anger that she displayed.  (Potter Dep. 72:12-77:24; 126:18-127:1; 140:11-14).  Because Potter had already made his decision not to offer her employment, he did not ask Ulmer the last  four standard interview questions.  (Potter Dep. 77:15-20; Defendant's Exhibit G).  Potter alone decided not to hire Ulmer, and he made that decision before Ulmer's final interview concluded.  (Plaintiff's Brief, ¶ 6; Potter Dep. 126:18-127:1; Hague Dep. 20:15-17).  Potter stated that he and Hague confirmed the decision to exclude her from further consideration "after she left" the interview.  (Potter Dep. 147:13-4). Hague stated that immediately after

4

Ulmer's interview, Potter and he agreed that Ulmer would be excluded from further consideration for a job.   According to Hague, Potter made the decision and Hague expressed his agreement with it.  (Hague Dep. 17:21-18:13; 20:15-17).

Following the interview, Ulmer encountered Leas in the Defendants' parking lot. Ulmer complained to Leas that the questions asked by Potter had violated her rights under the law.  When Ulmer observed Hague coming from the gym, she stopped talking to Leas. Ulmer stated that she watched as Hague got into a vehicle driven by Leas.  (Plaintiff's Brief page 6-7; Filing No. 43, Deposition of Cynthia Ulmer, 90:23 - 91:17).  Ulmer *assumes* that they discussed her complaints, and that her complaints were communicated back to Potter.

Some time later, Hague notified Ulmer that the Defendants decided not to offer her a Fitness Consultant position. (Defendants' Brief ¶ 9; Plaintiff's Brief ¶ 9).  Ultimately, the Defendants hired three male Fitness Consultants in Omaha and one female Fitness Consultant for the gym in Lincoln. (Defendants' Brief ¶ 10; Plaintiff's Brief ¶ 10).  One other female candidate was offered a Fitness Consultant position in Omaha with Defendants, but she declined the offer.  (Defendants' Brief ¶ 10; Plaintiff's Brief ¶ 10).

On May 19, 2004, Ulmer filed a charge of discrimination with the Nebraska Equal Employment Opportunity Commission ("NEOC"). (Defendants' Brief ¶ 11; Plaintiff's Brief ¶ 11).  On January 20, 2006, the NEOC issued an Administrative Closure. (Defendants' Brief ¶ 11; Plaintiff's Brief ¶ 11).  On March 22, 2006, Ulmer received a "Right to Sue" letter from the Equal Employment Opportunity Commission ("EEOC").  (Defendants' Brief ¶ 12; Plaintiff's Brief ¶ 12).

## STANDARD OF REVIEW

In the context of a summary judgment motion, the Court's function is to consider the evidence and determine whether the moving party is entitled to judgment as a matter of law.  The proponent of a motion for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). A "genuine" issue of material fact is more than "some metaphysical doubt as to the material facts."  *Id.*

While there is no discrimination case exception to the application of Fed.R.Civ.P. 56, "we must exercise particular caution when examining the factual question of intent to ensure that we dutifully extend all justifiable inferences in favor of the non-moving party." Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1118 (8th Cir. 2006) (citations omitted). Although summary judgment is to be used sparingly in employment discrimination cases, it is appropriate where one party has failed to present evidence sufficient to create a jury question as to an essential element of its claim.  *Id.* at 1117.

## ANALYSIS

### I.    Ulmer's Title VII Claims

In the Eighth Circuit, a plaintiff alleging employment discrimination in violation of Title VII can overcome summary judgment in one of two ways.

> First, the employee can produce direct evidence of discrimination, that is, "evidence showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action."

*Russell v. City of Kansas City,* 414 F.3d 863, 866 (8th Cir. 2005) (*quoting Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

> Alternatively, if the employee lacks direct evidence of intentional discrimination, she may survive the employer's motion for summary judgment by "creating the requisite inference of unlawful discrimination" through the familiar three-step burden-shifting analysis originating in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

*Id.* at 866-67.  A plaintiff proceeding under the three-stage, burden-shifting standard set forth in *McDonnell Douglas*, must first establish a prima facie case of discrimination. Once the prima facie case is established, the burden shifts to the defendant to articulate a non-discriminatory reason for the adverse employment action.  *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993).  If the defendant articulates such a reason, the plaintiff must respond with sufficient evidence that the proffered reason was really a pretext for intentional discrimination.  At all times, the burden of persuasion on the ultimate question of discrimination remains with the plaintiff.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S.133, 142 (2000).

A.      **Sex Discrimination Claim**

1.      **Direct Evidence of Sex Discrimination**

Ulmer argues that some of the interview questions asked by Potter and the notes taken by Leas after interviews with Ulmer and other female applicants provide direct evidence of sex discrimination.  Ulmer states that Potter asked her to explain her family history, identify her marital status, explain why her parents did not have more children, explain why she did not get along with her mother, and his request for a reference from a former boyfriend or girlfriend.  (Filing No. 42, Ex. 7).   Though these questions may be considered highly personal or inappropriate given their tangential relevance to the job opening, the Court does not find that these questions constitute direct evidence of sex discrimination.  Where a remark, or as in this case a question, does not reflect a negative attitude or bias against a protected class generally, it is not direct evidence of discrimination. *See Deneen v. NW. Airlines, Inc.*, 132 F.3d 431, 436 (8th Cir. 1998); *Fjelsta v. Zogg Dermatology, PLC*, 2007 WL 1531237, *3 (8th Cir. 2007).  The Court concludes that these questions fail to show the necessary link between a discriminatory animus based on Ulmer's sex and her exclusion from consideration for employment.

Leas's notes from his several interviews[2] reveal that Leas considered the applicants' sex, in at least one instance, in ranking the applicants from most to least desirable for

_____

[2]      Ulmer also points to Leas's interview summaries as evidence of sex discrimination and pretext.  In these documents, Leas wrote:  "Jennifer [Carlson] is my #3 but if I didn't feel we needed another man also, she would have been my #2; " and "I put her [Andrea McVea] down on my list to 6th simply because I feel the other 2 women above her are stronger and a better fit for the club." (Filing No. 42, Plaintiff's Index of Evidence, Exs. 5 and 6). There is evidence that Ulmer was Leas's first choice among all the candidates regardless of sex.  (*Id.* Ex. 4).  Because it is undisputed that Potter was the sole decision-maker with respect to Ulmer's application, and that Potter did not consult the notes before making his decision regarding Ulmer, Leas's notes fall squarely within the stray-comments line of cases and are legally insufficient to constitute direct evidence of sex discrimination.

hiring.  However, the Court finds that Leas's notes are not direct evidence of sex discrimination because Leas was not consulted in the final decision to exclude Ulmer from consideration and Leas's notes and rankings were not used by Potter in making his decision not to hire Ulmer.  The Court concludes that Ulmer's evidence of Potter's inappropriate interview questions and of notes taken by Leas following his initial interviews are not sufficiently connected to the hiring decision to be considered direct evidence of sex discrimination.  Rather, the Court concludes that Potter's bizarre interview questions and Leas's notes fall within the stray-comments line of cases and were not related to the decision not to hire Ulmer.  *See  Twymon v. Wells Fargo & Co.*, 462 F.3d 925, 934 (8th Cir. 2006) (decision makers' racially offensive statements not related to decisional process constitute stray comments, not strong evidence of discriminatory intent), *Beshears v Asbill*, 930 F.2d, 1348, 1354 (8th Cir. 1991) (stating that a stray remark by a decision maker, a statement by a non-decision maker, or a statement by a decision -maker  unrelated to the decisional process itself will not suffice.)  Finding no direct evidence of sex discrimination, the Court will consider Ulmer's sex discrimination case under the *McDonnell Douglas* analytical framework.

### 2.    Indirect Evidence

The Defendants argue that Ulmer cannot establish a prima facie case of sex discrimination because she was not qualified for the job and was not rejected under circumstances giving rise to an inference of unlawful discrimination. Further, the Defendants argue, even if Ulmer could establish a prima facie case, they had a legitimate, non-discriminatory reason to not hire her, and Ulmer can produce no evidence that their stated reason is a pretext for sex discrimination.

To establish a prima facie case of sex discrimination in the hiring context, a female plaintiff must show (1) that she is a member of a protected class; (2) that she was qualified for the position for which the employer was accepting applications; (3) that she was denied the position; and (4) that the employer hired a man for the position. *Kobrin v. University of Minnesota,* 34 F.3d 698, 702 (8th Cir. 1994) (citing *Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993); *see also Arraleh v. County of Ramsey*, 461 F.3d 967, 975 (8th Cir. 2006). Ulmer can establish that she applied for an available position, and that she was qualified for the position for which the Defendants were accepting applications,[3] that she was denied the position, and that three men were hired to fill the Fitness Consultant positions that were available in Omaha. The Court finds that Ulmer's evidence is sufficient to show that she was rejected under circumstances that give rise to an inference of unlawful discrimination. The burden of production at the prima facie stage is not onerous, and the Court finds that she has satisfied her burden at the prima facie level.

The burden shifts to the Defendants to state a legitimate, non-discriminatory reason for deciding not to hire Ulmer. The Defendants have satisfied their burden. Potter stated several reasons for not hiring Ulmer, chief among which was the inconsistent account she gave regarding the disposition of her businesses. (Potter Dep. 73:12-16). Hague described this as "catching her in a lie." Potter also stated that she conveyed to him no passion for fitness, and that she got angry during the interview, all of which convinced him

---

[3] The Defendants contend that Ulmer was not qualified for the position of Fitness Consultant based on her responses to the interview questions. The Court finds that there is sufficient evidence to conclude that Ulmer was qualified for the position given her background in the military and health care fields, and because she was owner of a business. Perhaps most important is that Ulmer interviewed three times with Leas, and he recommended her for a final interview with Potter and Hague, presumably with the finding that she was objectively qualified.

10

to exclude her from further consideration for the Fitness Consultant position. (Potter Dep. at 72:12-77:24)  The Court finds that the Defendants have stated a legitimate, non-discriminatory reason for not hiring her.

When the employer satisfies its burden, the presumption of discrimination disappears and the burden shifts back to the employee to produce evidence that the Defendant's reason is a pretext for sex discrimination. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. at 510-511.  The Court finds that Ulmer cannot satisfy this burden. The record demonstrates that, in addition to the male applicants who were offered employment, one female applicant was offered a job in Omaha but she declined it, and another female applicant was offered a job in Lincoln and accepted it.  Where, as here, two of five offers of employment are made to females, the evidentiary strength of discriminatory animus based on sex is greatly diminished.  This is no evidence that the Defendants' stated reason for not hiring Ulmer was a pretext for sex discrimination.

Ulmer also testified that, during her conversation with Leas, Leas told her that Potter wanted to hire only males.  (Ulmer Dep at 78-80:11). Leas denies making the comment. Ulmer's testimony contradicts Potter's own testimony, who stated that he has a preference for hiring female candidates for sales positions, and that he did not hire Ulmer "despite the fact that she was female." (Potter Dep. 123:16-25, 141:1-4).  The Court will assume, for purposes of summary judgment only,  that Leas made the statement about Potter's hiring preference to Ulmer.  Even so, Leas's comment is insufficient to overcome the Defendants' properly presented evidence in support of their motion for summary judgment.  The evidentiary value of the comment is that of a stray comment by a non-decision maker – standing by itself insufficient to create a genuine issue regarding pretext.  Despite her

11

argument that she was more qualified for the job than others who were hired, Ulmer has failed to show that any of the candidates hired by the Defendants was less qualified than she was.  Ulmer has presented no evidence that the Defendants' reasons for excluding her from further consideration changed over time.  Ulmer has failed to present any credible evidence to create a genuine issue that Potter's reasons for not hiring her were a pretext for discrimination. Because the Court finds that no reasonable jury could return a verdict in Plaintiff's favor on the sex discrimination claim, the Defendants' motion for summary judgment on this claim will be granted.

**B. National Origin Claim**

The Defendants argue that Ulmer cannot establish a prima facie case of discrimination based on her national origin because Potter was unaware of Ulmer's national origin.  Ulmer argues that the questions asked during her interview, for example, inquiring about where she was born and raised, were irrelevant, served no legitimate purpose, and raise an inference of discrimination sufficient to establish a prima facie case. While Ulmer can establish that she applied for job for which she was qualified, the Court concludes that Ulmer has not presented evidence to demonstrate that she was rejected under circumstances that give rise to an inference of unlawful discrimination due to her national origin.

The Court finds that the two questions asked by Potter form the basis for Ulmer's claim of national origin discrimination, and they are legally insufficient to give rise to an inference of discrimination.  Potter asked Ulmer where she was born and where she was raised.  Ulmer responded that she was born and raised in Carthage, Missouri.  Ulmer testified in her deposition that her national origin was "American Caucasian" and that her

ancestry is German and French.  Potter explained that he asked Ulmer where she was born and her place of birth because he thought it might demonstrate a propensity for hard work.  For example, Potter stated that he thought people with a farming background might have a strong work ethic. (Potter Dep. 136:10-25).

Whatever the purpose of these two questions, there is no evidence that the questions concerning Ulmer's place of birth or former residence affected the Defendants' employment decision.  The Court observes that these are the types of questions that are commonly asked in an interview setting in order to ease into conversation and to get to know a person.  That Ulmer's ancestors are from France and Germany do not set her apart from other applicants.  On these facts, the Court finds that no reasonable juror could conclude that asking Ulmer where she was born and raised gives rise to an inference unlawful discrimination based on national origin.

Assuming, arguendo, that Ulmer could establish a prima facie case of discrimination based on national origin, the Defendants have articulated a non-discriminatory reason for not hiring Ulmer. Potter did not hire Ulmer, as more fully explained above, based on her answers relative to the disposition of her businesses, the anger she displayed when asked about her credit history, and the lack of passion for fitness that she communicated to Potter.  Ulmer has presented no evidence that the Defendants' stated reasons are simply a pretext for not hiring her because of her national origin.  Ulmer is Caucasian; she does not speak with a foreign accent; she is not from an immigrant family; and she wears no clothing that might designate her ancestry.  (Ulmer Dep. 48).  There is no evidence that Potter knew Ulmer's family's national origin at the time he made the decision not to hire

13

her.  For all these reasons, Defendants' motion for summary judgment will be granted on this claim.

## C.     Retaliation Claim

The Defendants also seek summary judgment on Ulmer's retaliation claim, arguing that Ulmer cannot establish a prima facie case of retaliation. The Defendants contend that Ulmer did not engage in protected conduct and that she cannot show a causal relationship between the alleged protected conduct and Potter's decision not to hire Ulmer.  Ulmer argues that she can establish a prima facie case of retaliation because her complaint to Leas was protected conduct, Leas was bound under company policy to report Ulmer's complaint to Potter, and therefore, Potter decided not to hire her because she complained about the interview questions.

Because there is no direct evidence of retaliation, the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), will be used to analyze Ulmer's retaliation claim.  To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) she engaged in protected conduct; (2) a reasonable employee would have found the challenged retaliatory action materially adverse; and (3) the materially adverse action was causally linked to the protected conduct.  *Higgins v. Gonzales*, 481 F.3d 578, 589 (8th Cir. 2007) (citing  Burlington N. & Santa Fe Ry. Co. v. White,126 S.Ct. 2405 (2006)).  *See also Carrington v. City of Des Moines*, 481 F.3d 1046, 1050 (8th Cir. 2007).

The Court finds that Ulmer has satisfied her burden of showing that she engaged in protected conduct. To establish that she engaged in protected conduct, Ulmer "need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying challenged conduct

14

violated the law." *Buettner v. Arch Coal Sales Co., Inc.*, 216 F.3d 707, 714 (8th Cir. 2000) (citing *Wentz v Maryland Cas. Co.*, 869 F.2d 1153, 1155 ( 8th Cir. 1989)).  Ulmer's belief that some of Potter's interview questions violated the law was reasonable given the personal nature of some questions and their apparent unrelatedness to the Fitness Consultant position.  Moreover, there is no indication that she acted other than in good faith in taking her complaints about those questions to the Defendants' human resources coordinator, Leas.  It is undisputed that Ulmer encountered Leas immediately following the interview, and she told Leas that Potter asked inappropriate questions that had left her "feeling extremely violated."  (Ulmer Dep. 90:24 - 91:17).  Accordingly, the Court finds that Ulmer has demonstrated that she engaged in protected conduct satisfying the first element of the prima facie case.

The Court also finds that Ulmer has satisfied her burden of establishing, based on an objective standard, that a reasonable person under similar circumstances would have found the challenged retaliatory action materially adverse.   An alleged retaliatory action is materially adverse if it would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S. Ct. at 2415.  The Court concludes that a reasonable job applicant would be reluctant to complain to a potential employer that some of the interview questions violated the law for fear that such complaints would eliminate them from consideration for the job. The second element is satisfied.

While Ulmer has evidence of the first two elements of a prima facie case of retaliation, the Court finds that she has not satisfied the final element.   There is no evidence that the substance of Ulmer's complaints to Leas, or the fact that she had complained, was communicated to Potter before he made the decision not to hire Ulmer.

Potter has stated that he decided not to hire Ulmer during the interview itself (Potter Dep. 140:11-14), and that he and Hague confirmed her exclusion from the applicants under consideration "after she left" the interview.  (Potter Dep. 72:12-77:24; 126:18-127:1; 140:11-14; Hague Dep. 15:12-16:17, 17:2-15).  All the evidence supports the fact that Ulmer was excluded from consideration before Ulmer even engaged in the protected activity.

Ulmer's evidence that Leas likely communicated her complaints about the final interview to Hague may present a genuine issue of fact, but this fact is not material.  Even if Leas told Hague about Ulmer's complaint, Ulmer has presented no evidence that news of her complaint made it back to Potter before the decision was made not to hire her. Ulmer insists that Leas must have discussed the matter with Potter and Hague because he was under a duty pursuant to company policy to report Ulmer's complaint. While it appears from the evidence that Leas had some corporate responsibility to report Ulmer's complaint, there is no evidence that he did so.  Ulmer's argument that Leas must have spoken to Potter is not based on any evidence, only on speculation and conjecture, neither of which is sufficient to overcome the Defendants' summary judgment motion.

Finally, the evidence is uncontroverted that Potter decided not to hire Ulmer before he learned of Ulmer's complaint to Leas. (Potter Dep. 140:11-21).  Ulmer neither disputes this fact in her brief nor does she produce any evidence to raise a genuine issue relative to the timing of the events.  The evidence is that Potter, who had the final decision-making authority, decided to exclude Ulmer from further consideration during the interview itself; that immediately after the interview, Potter communicated his decision to Hague, who concurred; and that the decision to exclude Ulmer was made before Potter could have had

16

knowledge of Ulmer's complaints to Leas.  *See Couch v. Sprint Corp.* 131 F.3d 764, 765 (8th Cir. 1997)(affirming the district court's summary judgment in favor of the employer on a retaliation claim where employee had failed to show that the decision-maker knew that the employee had made a complaint.)  Because Ulmer's protected activity cannot be causally connected to a hiring decision that was made before she engaged in the protected activity, the Defendants are entitled to summary judgment on her claim of retaliation under Title VII.

## II. Nebraska State Law Claims[4]

The Nebraska Supreme Court has long recognized that "[s]ince the Nebraska Fair Employment Practice Act is patterned after Title VII of the Civil Rights Act of 1964, . . . it is appropriate to consider federal court decisions construing the federal legislation" in interpreting the state law.  *City of Fort Calhoun v. Collins*, 500 N.W.2d 822, 825 (Neb. 1993).  Accordingly, and for the same reasons that the Defendants are entitled to summary judgment on Ulmer's Title VII claims of discrimination based on sex and national origin, the Defendants are entitled to summary judgment on Ulmer's  NFEPA claims of sex and national origin discrimination.

---

[4]  The Defendants argue that this Court should dismiss these claims because Ulmer failed to file this claim within the 90-day deadline articulated in Neb. Rev. Stat. § 48-1120.01, which states: "the deadline for filing an action directly in the district court is ninety days after the complainant receives notice of the last action the commission will take on the complaint or charge." Neb. Rev. Stat. § 48-1120.01 (2006). The Defendants argue that the issuance of the administrative closure is the NEOC's last action. The NEOC issued the Administrative Closure on January 20, 2006. Thus, because Ulmer filed her lawsuit on May 17, 2005, Defendants argue that Ulmer missed the 90-day deadline to file a lawsuit.  Ulmer argues that the 90-day deadline: (1) applies only to actions brought directly in the state district court, (2) did not begin to run until receipt of the EEOC's "Right to Sue" letter, and (3) is a statute of limitations which may and should be tolled. For purposes of this motion, I will assume, without deciding, that Ulmer's state law claims of discrimination based on sex, national origin, and marital status in violation of the NFEPA are not time-barred.

In addition to protection against sex and national origin discrimination, Nebraska law also provides protection from unlawful discrimination based on marital status pursuant to Neb. Rev. Stat. § 48-1104 (2006). With regard to Ulmer's claim of discrimination based on marital status, she stated in her deposition that the only factual basis for her claim of discrimination based on her marital status is that Potter asked her if she was married. It is Ulmer's belief that, by simply asking the question of her, Potter violated her rights under Nebraska law. (Ulmer Dep. 61:3-23). However, Ulmer can point to no evidence that demonstrates that there is a genuine issue of material fact regarding whether her marital status played a role in the Defendants' hiring decision. (Ulmer Dep. 64:9-66:18). Potter stated that the Defendants have hired both married and unmarried persons as Fitness Consultants, and that marital status has no bearing on his hiring decisions. (Potter Dep. 143:2-10).

The Court concludes that simply asking about an applicant's marital status in the context of an employment interview does not violate the law because the law requires some causal connection between the allegedly discriminatory behavior and the adverse employment action. *See also Stokes v. City of Omaha,* 23 F.3d 1362, 1367 (8th Cir. 1994) (stating that an isolated question regarding Stokes's age, although improper, was not sufficient to support a finding that the City delayed Stokes's promotion because of his age). Because Ulmer has failed to come forward with some evidence that causally links the marital status question to the Defendants' decision not to hire her, the Court concludes that the Defendants are entitled to summary judgment on Ulmer's claim of discrimination based on marital status.

## CONCLUSION

Cynthia Ulmer took offense to some very personal and arguably inappropriate interview questions because she did not view them as related to the Fitness Consultant position for which she had applied.  Questions that are not relevant in the mind of the applicant may or may not be relevant to the potential employer.  Regardless, such questions are not actionable unless they are unlawful or discriminatory.  Because the Court finds that there are no genuine issues of material fact remaining with respect to Ulmer's claims of discrimination and retaliation, the Defendants are entitled to judgment on all claims as a matter of law.

IT IS ORDERED:

1.      The Defendants' Motion for Summary Judgment (Filing No. 36) is granted in its entirety;

2.      The Complaint, including all claims of discrimination based on sex, national origin, marital status, and retaliation in violation of  Title VII and the NFEPA, are dismissed with prejudice;

3.      A separate judgment shall be filed.

DATED this 5th day of July, 2007.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge

19